IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ESTATE OF ANTONIO J. PALUMBO
DECEASED PNC BANK, NATIONAL
ASSOCIATION, EXECUTOR,                          10cv0760
                                                **ELECTRONICALLY FILED**
        Plaintiff,

   v.

UNITED STATES OF AMERICA,

        Defendant.

## MEMORANDUM OPINION

Before the Court are the parties' cross-motions for summary judgment. The Estate of Antonio Palumbo and its Executor (hereinafter "Plaintiff") brought this action seeking a refund (plus accrued interest) of an alleged overpayment of Federal estate taxes. Plaintiff paid federal estate taxes on an amount – $11,721,141.00 – which was paid to a charitable trust created by Mr. Palumbo during his lifetime. This payment was made to the charitable trust under the terms of a settlement agreement negotiated (primarily) between Mr. Palumbo's son and intestate heir, although all legatees signed the agreement.

Plaintiff's Complaint asserts that Plaintiff is entitled to a return of the taxes paid on the $11,721,141.00 (plus interest), claiming under Section 2055 of the Internal Revenue Code (26 U.S.C. § 2055, hereinafter "2055"), this amount should constituted a charitable deduction. Plaintiff's Motion for Summary Judgment contends that all evidence produced demonstrates that the transfer of $11,721,141.00 to the Charitable Trust via the settlement agreement complies with the requirements of 2055, thereby requiring the sum of $11,721,141.00 to be deducted from Mr. Palumbo's gross estate and from federal estate taxation.

Defendant disagrees arguing that the $11,721,141.00 amount was paid by operation of a settlement agreement, not by operation of a residuary clause in Mr. Palumbo's Last Will and Testament, and thus, cannot be claimed as a charitable deduction from the Estate. The issue before this Court is whether the charitable trust had an enforceable right to the residuary estate apart from the settlement agreement.

For the reasons set forth in greater detail below, this Court will grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

The following facts are material and are not contested by either the Plaintiff or Defendant thereby rendering this matter ripe for summary judgment.

Mr. Palumbo died on December 16, 2002. See doc. no. 36 at ¶¶ 1, 38. In 1974, during his lifetime, Mr. Palumbo created the A.J. and Sigismunda Palumbo Charitable Trust (hereinafter "the Charitable Trust"). Id. at ¶¶ 2, 40.

Mr. Palumbo executed various wills and trust instruments with testamentary provisions during his lifetime. Id. at ¶¶ 3, 39, 41. At the time of his death, Mr. Palumbo's Last Will and Testament executed on July 6, 1999 (hereinafter, "the 1999 Will"), together with its three codicils was in effect. Id. at ¶¶ 4-5, 39.

Plaintiff claims that "[t]he first paragraph of the 1999 Will addresses [Mr. Palumbo's] residuary estate by providing that the Executor is to pay out of the residuary estate all inheritance, legacy estate or other death taxes of whatsoever nature on [Mr. Palumbo's] estate or on the devolution of any portion thereof, . . . ." Id. at ¶ 4. Plaintiff also claims that the third paragraph of the 1999 Will identifies and defines the Charitable Trust, naming it as "a remainder beneficiary in several places throughout the 1999 Will and the three Codicils . . . ." Id. at ¶ 5.

The parties agree that there was no express residuary provision in the 1999 Will – although there had been such a provision in previous versions – or any of its codicils, and this was due to a scrivener's error on the part of Mr. Palumbo's attorney. Id. at ¶¶ 15, 41, 43. As a result of the lack of a residuary provision, Mr. Palumbo's son claimed that as the sole intestate heir, he alone was entitled to the residuary estate; but, the Charitable Trust contacted Mr. Palumbo's son and claimed that it was entitled to the residuary estate because the missing residuary clause in the 1999 Will was due to scrivener's error. Id. at ¶¶ 16, 44. Counsel for Mr. Palumbo's son and the Charitable Trust entered into negotiations and eventually reached a settlement agreement with respect of the distribution of the residuary estate. Id. at ¶¶ 18, 48. The settlement was agreed to by Mr. Palumbo's son, the Charitable Trust, Mr. Palumbo's daughter-in-law, Mr. Palumbo's wife at the time of his death, and the Attorney General for the Commonwealth of Pennsylvania. Id. at ¶ 18.

Pursuant to the terms of the settlement agreement, the Charitable Trust received a portion of the residuary estate – $11,721,141.00 – while Mr. Palumbo's son received $5,600,000.00 and real property in Wheeling, West Virginia. Id. at ¶¶ 24, 48. The settlement agreement was approved by a July 10, 2003 Order of the Orphans' Court Division of the Court of Common Pleas of Elk County, Pennsylvania upon the filing of a joint petition for approval of the settlement. Id. at ¶ 27, 51.

Subsequent to entering into this settlement agreement, Plaintiff filed a claim for a federal estate tax charitable deduction in the amount of $11,721,141.00. The Commissioner of Internal Revenue disallowed the charitable deduction of $11,721,141.00, finding that it had been made by Mr. Palumbo's son via a settlement agreement, and not by Mr. Palumbo through his 1999 Will.

## II. STANDARD OF REVIEW

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, (1986). "Facts that could alter the outcome are material facts." Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir.1994). Disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248.

A party moving for summary judgment has the initial burden of supporting its assertion that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the record – *i.e.*, depositions, documents, affidavits, stipulations, or other materials – or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its fact(s). Fed.R.Civ.P. 56(c)(1).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that fact(s) are genuinely disputed by citing to particular parts of materials in the record, or by showing that: (1) the materials cited by the moving party do not establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s). Id.

In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir.1995).

As in this case, when the parties have filed cross-motions for summary judgment, the summary judgment standard remains the same. Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F.Supp.2d 425, 430 (M.D.Pa. 2006) (citing Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir.1987)). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.' " Id. "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Id.

Based upon this standard, the Court has reviewed each of the party's respective Motions and their respective Responses.

### III. DISCUSSION

**A. Statutory Construction**

Because the parties concede the material facts referenced above are not contested, the sole issue before this Court is whether the sum of $11,721,141.00 qualifies as a charitable deduction under Section 2055. If so, this sum does not become part of the gross estate subject to federal estate taxation, thereby entitling Plaintiff to a refund (plus interest) on the taxes it paid related to that sum.

Section 2055 reads in pertinent part as follows:

§ 2055. Transfers for public, charitable, and religious uses

> (a) In general. For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers —
>
> \* \* \*
>
> (3) to a trustee or trustees . . . but only if such contributions or gifts are to be used by such trustee or trustees, exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, such trust, fraternal society, order, or association would not be disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and such trustee or trustees, or such fraternal society, order, or association, does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office;

26 U.S.C. § 2055.

Here, this Court is being asked by both parties (in their respective cross-motions for summary judgment) to interpret Section 2055, which is a correct first step. See Lyeth v. Hoey, 305 U.S. 188, 194 (1938) ("In dealing with the meaning and application of an act of Congress enacted in the exercise of its plenary power under the Constitution to tax income and grant exemptions from that tax, it is the will of Congress which controls, and the expression of its will, in the absence of language evidencing a different purpose, should be interpreted so as to give a uniform application to a nation-wide scheme of taxation.").

Each party would have this Court construe Section 2055 to their respective advantages. The first step when construing a federal taxing statute, such as this one, is to review the statute's legislative history. See C. I. R. v. Bosch's Estate, 387 U.S. 456, 463-64 (1967) (strictly construing the marital deduction statute (26 U.S.C. § 2056) and finding that the Senate Finance Committee used 'very guarded language' referring to the precise issue present in the Bosch case).

The Senate Finance Committee, in Report No. 91-552, noted that the Tax Reform Act of 1969, represented a "substantive and comprehensive reform" of the income tax laws and that there was "no prior tax reform bill of equal substantive scope." 1969 U.S.C.C.A.N. 2027, 2027, 1969 WL 5896, *1. This same Report contained considerable discussion on the reformation of "charitable contributions." See 1969 U.S.C.C.A.N. 2027, generally. In this regard, the Senate Finance Committee noted that the then-present law limited a "charitable contributions deduction" to 30 percent of the taxpayer's adjusted gross income, but in the case of gifts to certain private foundations, limited the deduction to 20 percent of the taxpayer's adjusted gross income. 1969 U.S.C.C.A.N. 2027, 2106, 1969 WL 5896, *68. In other, albeit limited, circumstances, the Finance Committee noted that a taxpayer was allowed an unlimited charitable contributions deduction. Id.

The Senate Finance Committee stated in this same report that one of the general reasons it sought to change the tax law governing the taxation of charitable contributions was to "strengthen the incentive effect of a charitable contributions deduction for taxpayers." Id. More specifically the Committee indicated, "[i]t is believed that the increase in the limitation will benefit taxpayers who donate substantial portions of their income to charity and for whom the incentive effect of the deduction is strong-- primarily taxpayers in the middle and upper-income ranges. Id. In addition, the combination of the increase in the limitation to 50 percent with the repeal of the unlimited charitable deduction means, in effect, that charity can remain an equal partner with respect to an individual's income; however, charitable contributions no longer will be allowed to reduce an individual's tax base by more than one-half." Id. at 2106-2107 and *68-69.

Here, Defendant refers to Bosch's Estate, not for its directive concerning the review of legislative history, but rather to convince this Court that it should narrowly construe 2055 so as to require (and affirm) that the sum at issue be calculated into the gross estate for taxation purposes. Plaintiff contends that the Bosch case is inapposite to the present set of facts.

After reviewing the legislative history to 2055 (the Code section at issue here) governing charitable deductions, and 2056 (the Code section at issue in Bosch's Estate) governing martial deductions, this Court finds that these two sections of the Internal Revenue Code may be construed differently based upon Congressional intent. Given this Court's review of the legislative history and under the facts presented here, this Court declines to narrowly construe 2055.

Given this Court's finding that the legislative intent differs as to each section of the Code, this Court finds that Bosch's Estate, which addressed Section 2056 and was narrowly construed by the Supreme Court to curtail marital deduction abuses, does not apply here where the intent behind Section 2055 is to encourage charitable gifts.[1]

**B. Right to the Residuary Estate**

Next, Defendant contends this Court must grant summary judgment in Defendant's favor because Plaintiff had no legally enforceable right to the residuary estate. Defendant claims that because the Charitable Trust "had no enforceable right to any portion of the residuary estate under Pennsylvania law," there was no *bona fide* dispute between or among the parties. In support of this argument, Defendant relies on Bach v. McGinnes, 333 F.2d 979 (3d Cir.1964). The Court finds that this case warrants some discussion.

---

[1] This Court also notes that at least one other court has reached the same conclusion. See, Estate of Warren v. Commissioner, 981 F.2d 776, 781 (5th Cir. 1993) (holding that Bosch is limited to marital deduction cases and does not apply to charitable deduction cases). Although Defendant cites three cases in support of its argument that Bosch controls this charitable deduction matter, this Court notes that none of these cases require the interpretation of Section 2055. See, Hunter v. United States, 597 F.Supp. 1293 (W.D. Pa. 1984); Berger v. United States, 487 F.Supp. 49 (W.D. Pa. 1980); and Rudin v. United States, 285 F. Supp. 901 (E.D. Pa 1968).

8

In Bach, the district court dismissed, and the United States Court of Appeals for the Third Circuit affirmed, the plaintiffs' action for recovery of federal estate taxes paid following a disallowance of a claimed charitable deduction under 2055. Mr. Bach, like Mr. Palumbo died testate. Id. at 980. However, unlike Mr. Palumbo's 1999 Will, Mr. Bach's will devised and bequeathed the residue of his estate, in trust, to his wife, for life. Id. Mr. Bach's will also indicated that upon the death of his wife, the trust principal was to be divided into three equal parts and distributed to three of his relatives - one niece and two nephews. Id. All three of these relatives (as well as the wives of the two nephews) had to predecease Mr. Bach's wife, in order for the principal of the trust to be distributed to Drexel Institute of Technology. Id.

Upon Mr. Bach's death, Mrs. Bach was informed by her attorney that, under Pennsylvania law, she had the right to take against her husband's will and receive one-half of his estate outright. Id. Mrs. Bach also informed her attorney that she was "perturbed" that Drexel Institute would receive something only if her niece, two nephews, and the nephews' wives all predeceased her. Id. Her attorney contacted the niece and the nephews and informed them that Mrs. Bach was considering taking against the will, and would most likely obtain one-half of the estate if she chose to do so, thereby leaving the other one-half to be distributed among the other residuary beneficiaries. Id. at 981. He also informed them that it was possible that during this process, a court might hold the other one-half of the estate in escrow until Mrs. Bach's death, and until then, no beneficiary would receive any part of the estate. Id. He suggested that they accept a lump sum in lieu of their respective interests in the estate should Mrs. Bach elect to take against the will with any remainder going to Drexel Institute. Id. They all agreed to do so, and each legatee (meaning the niece, the nephews and their wives, and Drexel Institute) signed an agreement to that effect. Id.

9

Mrs. Bach elected to take against the will and receive one-half of the estate. Id. During this process, the Orphans' Court approved the settlement agreement and Drexel Institute received $186,199 after the lump sums were paid to the niece and nephews. Id. The Internal Revenue Commissioner disallowed the $186,199 to be considered as a charitable deduction, and after the estate paid estate taxes on that sum, the Commissioner denied the estate's request for a refund. Id.

In upholding the Commissioner's decision, the district court first noted that even though Drexel Institute was named as part of the residuary estate, the bequest to Drexel was "so remote as to be negligible." Id. at 982. On appeal, the Court of Appeals affirmed the district court's finding. Id. at 983.

In addition, the Court of Appeals also affirmed the district court's second basis for upholding the Commissioner's decision. Id. Specifically, the Court of Appeals held:

> We further agree with the District Court's second ground for dismissing the estate's action, viz., that Mrs. Bach's election to take against the will 'accelerated the remainder interest of the named relatives and deprived Drexel Institute of its contingent legacy', and accordingly, 'what Drexel Institute actually received under the settlement agreement it received from the named relatives and not from the testator.'
>
> \* \* \*
>
> We agree with the District Court's holding that 'The provisions of the will in the present case indicate that the testator intended to provide for his wife first and after her, his named relatives and that only after these favored legatees had been provided for was Drexel Institute to receive anything.' 218 F.Supp. 916. Under no circumstance could it be reasonably contended that the will 'plainly indicates a contrary intent.'
>
> As the District Court so well said: 'The will, as modified by the widow's election, gave Drexel Institute nothing. What Drexel Institute actually received under the settlement agreement it received from the named relatives and not from the testator. \* \* \* Hence there can be no charitable deduction.' 218 F.Supp. 916. Estate of Carey v. Commission, 9 T.C. 1047, 1053 (1947), aff'd per cur., sub nom.

Marine National Bank of Erie v. Commissioner, 168 F.2d 400 (3 Cir.) and
Robbins v. Commissioner, 111 F.2d 828 (1 Cir. 1940) are in full accord.

Id. at 983-84.

Turning to the instant matter, the factual differences between the Bach case and this one are important. Here, Mr. Palumbo, the testator, repeatedly manifested his intent to leave the residuary of his estate to the Charitable Trust as is evidenced by earlier iterations of his Last Will and Testament and other documents provided to this Court by the parties. Here, the testator's attorney has admitted to committing scrivener's error upon drafting the 1999 Will, specifically noting that he failed to include a provision concerning the residuary estate.

Although Defendant contends that the first basis for disallowing the charitable deduction discussed in Bach holds true here – *i.e.* that the Charitable Trust, like Drexel, had no enforceable legal right to anything – this Court does not agree.[2] In Bach, by operation of law, there was nothing left to bequeath to Drexel once the testator's wife took her one-half share of the estate, accelerating the rights of the niece, nephews, and nephews' wives to their shares, thereby eliminating any residuary to be distributed to Drexel. Simply put, mathematics and actuarial science prevented Drexel from taking any share of the residuary estate because there was nothing to distribute.

Here, unlike Bach, there is plenty to distribute – the question is to whom. The 1999 Will, unlike all prior wills and other testamentary documents, did not contain a residuary clause; but all prior iterations left the residuary estate to the Charitable Trust. Moreover, there is unrefuted evidence that Mr. Palumbo intended to 1999 Will to continue to provide the residuary estate to the Charitable Trust. As noted above, the admission by Mr. Palumbo's attorney to a scrivener's error upon preparation of the 1999 Will, during the legal malpractice lawsuit brought against him

---

[2] Defendant does not specifically rely on Bach for this principle, but makes the same argument, regardless, without citing to the Bach case.

has gone unrefuted by Defendant. Thus, whether the Charitable Trust would have been deemed a legatee here is the issue; unlike <u>Bach</u> where the issue was whether there were any funds left to distribute to Drexel.

Plaintiff, in its brief in support of summary judgment, also notes yet another difference between this case and <u>Bach</u>. As explained by Plaintiff, in this matter, a good faith adversarial dispute ensued – something that is crucial in a will contest situation to determine whether a deduction is allowable. In <u>Bach</u>, there was no such adversarial proceeding present; and quite to the contrary, evidence of collusion was present given that Mrs. Bach's attorney was recommended to her by a co-executor and Secretary of Drexel's Board of Trustees.

To this point, this Court finds <u>Dumont's Estate v. Commissioner</u>, 150 F.2d 691 (3d Cir. 1945), instructive. In <u>Dumont's Estate</u>, the decedent executed two wills, and in both, bequeathed the residuary estate to Lafayette College. <u>Id</u>. at 691. The two wills were identical with respect to the residuary devise and bequest to Lafayette College, except for an immaterial survivorship annuity provided for in the later will. <u>Id</u>. The latter residuary clause was deemed void under Pennsylvania law because it was executed less than thirty days prior to the date of the decedent's death, thereby causing the residuary to pass via intestacy to the decedent's next of kin. <u>Id</u>.

The President of Layfette College and the next of kin entered into a settlement agreement for the residuary estate and the agreement was approved by the Orphans' Court. <u>Id</u>. at 692. When the estate tax return was prepared, the executor did not include the amount paid to Lafayette College as a charitable deduction. The Commissioner disallowed the deduction, and on appeal to the Tax Court, the majority held that Lafayette College acquired the residue of the testator's property as purchaser from his heirs and next of kin and not as legatee.

On appeal, the United States Court of Appeals for the Third Circuit reversed, holding:

> We think the error of the tax court inheres in its failure to consider as determinative the fact that Lafayette College occupied the position of legatee under a prior will and did not need to rely upon the probated will, under which its bequest was undoubtedly void under Pennsylvania law. What Lafayette College acquired was the result of a compromise in settlement of its attack upon the later will. Its right to contest was grounded upon its status under the earlier will as residuary legatee.

Id. at 692-93.

In concluding that the estate was entitled to deduct the amount paid to Lafayette College through the settlement as a charitable contribution, the Court of Appeals relied on the Supreme Court's decision in Lyeth v. Hoey, 305 U.S. 188 (1938), specifically noting:

> The Chief Justice made it clear that the construction of the exemption in the federal statute is to be determined by federal and not by local law, for he wrote (305 U.S. 193, 59 S.Ct. 158, 83 L.Ed. 119, 119 A.L.R. 410) that while the state establishes procedure governing the probate of wills and the processes of administration, determines the status of an heir as such, regulates the procedure whereby his rights can be vindicated and authorizes its courts to supervise the making of compromise agreements concerning will contests, 'when the contestant is an heir and a valid compromise agreement has been made and there is a distribution to the heir from the decedent's estate accordingly, the question whether what the heir has thus received has been 'acquired by inheritance' within the meaning of the federal statute necessarily is a federal question', not to be determined by local characterization.

Id. at 693.[3]

Defendant relies on Pennsylvania State Law for the proposition that this Court may not consider matters external to the 1999 Will. See Defendant's Brief, doc. no. 33, p. 9. Defendant argues that the Charitable Trust had no legal right to the residuary estate, given that the 1999 Will failed to include a provision for the residuary estate due to scrivener's error; and therefore, any sum the Charitable Trust acquired cannot be said to have passed from the testator through the 1999 Will, and thus, cannot be deemed a charitable deduction.

---

[3] The principle of Lyeth v. Hoey, supra, was also applied by the Court of Appeals for the Third Circuit in In re Sage's Estate, 122 F.2d 480, 483 (3d Cir. 1941).

This Court notes that it is generally the rule of law in Pennsylvania to look only to the "four corners" of a document in order to ascertain the testator's intent; however, like almost every rule there are exceptions. See, <u>Estate of Rosenberg v. Dep't of Pub. Welfare</u>, 679 A.2d 767, 772 n.3 (Pa.1996) ("Some of the evidence referred to is clearly outside the scope of inquiry permitted when it is necessary to go beyond the four corners of the trust instrument.") ; <u>Estate of Taylor</u>, 391 A.2d 991, 994 (Pa. 1978); and <u>Estate of Schwarbarth</u>, 466 A.2d 1382 (Pa. Super. 1983) (". . . the court cannot feel confidence in distributing the estate by reference to the terms of the Will alone . . .").

In <u>Taylor</u>, the Pennsylvania Supreme Court held:

> "It is, of course, a cardinal rule that a will is to be construed according to the intent of the testator." <u>Sykes Estate,</u> supra, quoting <u>Hamilton Estate</u>, 454 Pa. 495, 498, 312 A.2d 373 (1973). See also <u>Blough Estate</u>, 474 Pa. 177, 378 A.2d 276 (1977); <u>Hill Estate</u>, 432 Pa. 269, 247 A.2d 606 (1968). Where a court feels that it can with reasonable certainty ascertain the intent of the testator through examination of the will itself, the court generally does not look to matters external to that document. <u>Kelly Estate</u>, 473 Pa. 48, 373 A.2d 744 (1977); <u>Jacobson Estate</u>, 460 Pa. 118, 331 A.2d 447 (1975); <u>Soles Estate</u>, 451 Pa. 568, 304 A.2d 97, 99 (1973). Where, however, a court cannot feel such confidence in distributing the estate by reference to the will only, or where a latent ambiguity is discovered, it is proper and necessary to inquire into the circumstances of the testator at the time of execution of his will and other evidence which bears on intent. <u>Sykes Estate</u>, supra; <u>Kay Estate</u>, 456 Pa. 43, 317 A.2d 193 (1974); <u>Chambers Estate</u>, 438 Pa. 22, 263 A.2d 746 (1970). And if even then a court is unable to say with reasonable certainty what the testator intended, resort is had to the canons of construction. <u>Hamilton Estate</u>, supra; <u>Schappell Estate</u>, 424 Pa. 390, 227 A.2d 651 (1967).

<u>Taylor</u>, 391 A.2d at 994.

Moreover, this Court notes that in Pennsylvania, there is a long-standing, case law-supported history which indicates two general principles apply when interpreting a will: (1) when a person prepares a will it is presumed that the person intended to dispose of the entirety of the estate and not die intestate as to any portion of it, and if possible to do so, a will must be construed to avoid an intestacy (see, e.g. <u>In re Carmany's Estate</u>, 53 A.2d 731 (Pa. 1947); <u>In re</u>

Verner's Estate, 56 A.2d 667 (Pa. 1948); and In re: Farrington's Estate, 220 A.2d 790 (Pa. 1966)); and (2) the duty of the court is to ascertain, if possible, the intent of the testator. See, e.g. In re: Burleigh Estate, 175 A.2d 838 (Pa. 1961); In re: Western Pa. Nat'l Bank, 225 A.2d 676 (Pa. 1967); and In re: Hill's Estate, 247 A.2d 606 (Pa. 1968).

Here, there is no dispute that the 1999 Will was the last written iteration of Mr. Palumbo's intent. However, the parties concur that prior testamentary documentation provided for a residuary estate, and that in all prior documentation, the residuary estate was left to the Charitable Trust. It is also uncontested that Mr. Palumbo's attorney has admitted that he made a scrivener's error when preparing the 1999 Will, in that he failed to include a provision for the residuary estate. Finally, although the parties do not agree on the extent of the dispute concerning the residuary estate which arose between Mr. Palumbo's son and the Charitable Trust after Mr. Palumbo's death, they do agree that after the dispute arose, arm's length negotiations ensued which resulted the settlement agreement at issue here. As noted above, under the facts of this case, the parties agree that the sum of $11,721,141.00 was paid to the Charitable Trust pursuant to this settlement agreement which was negotiated among counsel for several interested parties, but primarily by counsel for the Charitable Trust and counsel for Mr. Palumbo's son.

Based on the evidence of record, and there being <u>no</u> evidence to the contrary, the Court finds that the negotiations were held at arms-length, that all of the legatees signed the settlement agreement (which was approved by the Orphan's Court), and there is no evidence of any collusion among the parties to the agreement nor any collusion on the part of their respective attorneys.

The parties also agree that all prior instruments contained provisions for the residuary estate to pass to the Charitable Trust. This evidences Mr. Palumbo's intent to devise and bequeath his residuary estate to the Charitable Trust.

Finally, there is no evidence that Mr. Palumbo intended to disinherit the Charitable Trust. To the contrary, there is ample evidence demonstrating that the only reason that the 1999 Will did not contain a residuary estate clause was due to a scrivener's error on the part of the testator's attorney.

This Court gives great weight to all of this evidence which supports the conclusion that the testator did not intend to disinherit the Charitable Trust. The 1999 Will which failed to provide for a residuary estate – the foundation for the Charitable Trust's status as a legatee in all prior instruments – did not contain this clause by design of the testator but due to human error on the part of the testator's attorney. As such, this Court finds that the sum of $11,721,141.00 should have been deducted from the gross estate as a charitable donation under 2055.

## IV. CONCLUSION

Based on the foregoing law and authority, Plaintiff's Motion for Summary Judgment shall be granted and Defendant's Motion for Summary Judgment shall be denied. An appropriate order follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:  All Registered ECF Counsel and Parties